UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                      :

CONSTANCE CRAIG,                       :

              Plaintiff,        :

        -v.-                   :

                                   :

COMMISSIONER OF SOCIAL      :
SECURITY,                     :

                                   :

              Defendant.   :
------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: _11/22/16_

**OPINION AND ORDER**

15-CV-4057 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Constance Craig brings this action seeking judicial review of a final determination by Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying Craig's application for disability insurance benefits ("DIB") and social security income ("SSI"). Craig moved, and the Commissioner cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Craig's motion is granted to the extent it seeks remand of the case, and the Commissioner's cross-motion is denied.

## I.    BACKGROUND

### A.    Procedural History

Craig filed an application for DIB on January 10, 2012, and an application for SSI benefits on January 17, 2012. Administrative Record ("R."), Dkt. No. 16, at 15. The amended alleged disability onset date in both applications was January 1, 2011. *Id.* The Social Security Administration ("SSA") denied her applications on

1

March 30, 2012, *id.* at 58, after which Craig requested an administrative hearing. *Id.* at 15, 66–68. Represented by counsel, Craig appeared before Administrative Law Judge ("ALJ") Robert C. Dorf on February 21, 2013. *Id.* at 27–48. In a written decision dated March 13, 2013, the ALJ found that Craig was not disabled for purposes of receiving Social Security benefits. *Id.* at 15–22. Craig filed an appeal of the decision, and included reports for two new Magnetic Resonance Imaging ("MRI") scans as additional evidence. *Id.* at 8–10.[1] On April 7, 2015, the SSA Appeals Council denied Craig's request for a review of the ALJ's decision, which thereby became the Commissioner's final determination. *Id.* at 1.

The current action was initiated on May 27, 2015 when Craig, again represented by counsel, filed a complaint seeking judicial review of the Commissioner's decision under 42 U.S.C. §§ 405(g) and 1383(c)(3). Complaint, Dkt. No. 2, at 1. Craig moved for judgment on the pleadings pursuant to Rule 12(c) on January 19, 2016, seeking reversal of the Commissioner's decision, or alternatively, a remand for further proceedings. Motion for Judgment on the Pleadings ("Pl. Mot."), Dkt. No. 12; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 13. The Commissioner filed a response on March 21, 2016, in which she cross-moved for judgment on the pleadings and filed the administrative record. Cross-Motion for Judgment on the Pleadings, Dkt. No. 14; Memorandum of Law in Opposition to Plaintiff's Motion for

---

[1] The MRIs were conducted on March 28, 2013 and April 11, 2013, within a month after the ALJ issued his decision. R. at 8–10.

2

Judgment on the Pleadings and in Support of Defendant's Cross-Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 15; R., Dkt. No. 16. No reply papers were filed.

## B.    The Administrative Record

### 1.    Craig's Background

Craig was born on February 6, 1971. R. at 33. She was 39 years old on the alleged disability onset date and 40 years old at the time of her application for DIB and SSI. *Id.* Craig has four children, and at the time of her hearing, she was living with two of her children in the Bronx. *Id.* at 32–33, 268, 563. Craig did not complete high school; her education ended at the eleventh grade. *Id.* at 35–36, 166. When she was in school, she was placed in special education classes due to her poor behavior, difficulty concentrating, and dyslexia. *Id.* at 35, 173, 324. She is able to read and write with difficulty. *Id.* at 36–37.

At the hearing, Craig's testimony concerning her last date of employment was inconsistent, but on several prior occasions she had reported that it ended in 2010. *Compare id.* at 39, *with id.* at 34, 157–58, 166–67. Her last job consisted of cleaning an elderly woman's home approximately twice a week for two to three hours each time. *Id.* at 34. After the woman entered a nursing home, Craig continued to work for her, but had to stop, "because things were getting a little too complicated for me to travel and stuff." *Id.* at 38. Craig testified that she had never obtained a home healthcare certification. *Id.* at 36.

3

During the hearing and in her submissions to the SSA, Craig described her ability to function and perform daily tasks. She testified that she can walk without assistance, though she has pain in her back and side. *Id.* at 37, 45. She is able to attend to her personal care, and can pay bills and handle money. *Id.* at 148, 150. At times she needs her daughter's help to zip or button her coat, because of pain and numbness in her hands, though she can dial a cell-phone. *Id.* at 42–43. Due to the numbness, she underwent surgery and received a shot of codeine. *Id.* at 41. Her daughters prepare meals, because she lacks the strength or desire to prepare them, though she does clean "constantly," as she suffers from anxiety attacks if her house looks dirty. *Id.* at 149, 173.

Craig normally helps her youngest daughter get ready for school, then goes back to bed. *Id.* at 33, 147. She spends most of her time in her room because she lacks the desire to do anything, and only goes out when she has medical appointments. *Id.* 147, 151. Craig explained that she relies on her daughters to accompany her to go grocery shopping, and that she is unable to travel without one of her daughters or her sister. *Id.* at 43, 48, 150, 331. Further, though she took public transportation to the hearing, she traveled with her daughter, and suffered from anxiety and difficulty breathing. *Id.* at 37, 48, 150, 331. Anxiety attacks prevent her from sleeping well, particularly if she has something scheduled the next day. *Id.* at 148, 173. Although Craig avoids going outside due to the anxiety, she attends church weekly with someone accompanying her. *Id.* at 151. She gets upset when she is around people, though she is able to spend time with her family and

4

friends because they are more aware of her mood swings and mental health conditions. *Id.* at 152, 173.

Craig's claims for DIB and SSI were based on her mental disorder, hypertension, diabetes, and anemia. *Id.* at 62, 64. Craig takes medication for her diabetes, but has not been able to manage it, and does not do the required testing or diet. *Id.* at 40–41. In terms of her mental health, Craig alleged that she suffers from mood disorder, bipolar disorder, anxiety attacks, depression, attention deficit disorder (ADD), and obsessive compulsive disorder (OCD). *Id.* at 165. Craig has been treated by the same psychiatrist for approximately ten years, and she sees him every four weeks. *Id.* at 43–44. She described having suicidal thoughts, depending on her mood, and hearing voices. *Id.* at 44, 152, 173, 329. She suffers from panic attacks about twice a week, which cause her to have trouble breathing, chest pain, and heart palpitations. *Id.* at 47, 173. Craig testified that her "head [was] confusing" her every day, and that she has memory and concentration problems that require medication. *Id.* at 45–46. At the time of the hearing, Craig estimated that she was taking about 11 different medications each day. *Compare id.* at 46, *with id.* at 168, 188 (listing eight to nine medications Craig is prescribed). She forgets to take her medications, and relies on her daughter to remind her. *Id.* at 149, 173. She has problems remembering appointments, following instructions, and completing tasks due to issues concentrating and an inability to focus. *Id.* at 152.

5

### 2.    Medical Evidence in the Record

#### a.    Medical History

##### i.    Diabetes and Anemia

Dr. Robert Dichter treated Craig's diabetes and diagnosed her with significant anemia caused by iron deficiency. *Id.* at 216–25. To treat the anemia, she was given a blood transfusion, and one of her medications was stopped because it was potentially contributing to the anemia. *Id.* at 221. Dr. Dichter also reported that Craig suffered chronic daily headaches. *Id.* Throughout Craig's medical records from Montefiore Medical Center ("Montefiore"), Dr. Dichter is listed as her primary care physician and is the doctor that other medical professionals directed their findings to with regards to Craig's health. *See, eg.*, *id.* at 195, 200–19.

##### ii.    Orthopedic Treatments

On December 17, 2012, Craig saw Dr. Roy Kulick for an orthopedic visit. *Id.* at 593–94. Craig complained of pain in her right thumb and left hand, which Dr. Kulick assessed as "trigger fingers in a diabetic," and gave her an injection of Depo-Medrol and Lidocaine in her right thumb and left ring flexor tendon sheath. *Id.* at 594. On January 4, 2013, Craig saw Dr. Chalyaporn Kulsakdinun and complained of bilateral foot pain. *Id.* at 602. After conducting an assessment, Dr. Kulsakdinum found no structural abnormalities, and simply recommended that Craig wear proper shoes and use over-the-counter cushioning. *Id.* at 604.

6

### iii.    FEGS Biopsychosocial Summary

On July 29, 2011, Craig underwent a FEGS evaluation. *Id.* at 317.[2] Craig

was seen by Dr. Rakesh Koul, who reported that she had a history of depression,

anxiety, ADD, OCD, and bipolar disorder, and that she cannot travel alone. *Id.* at

336.  He conducted a physical exam with normal results for all systems, but his

final diagnoses was that Craig suffered from episodic mood disorders, was unstable,

and required treatment. *Id.* at 338–39, 342.

On August 9, 2011, Craig was evaluated by Dr. Charles Pastor, who did not

complete the pain assessment or work limitations criteria, except to note that

Craig's environmental restrictions included enclosed spaces and groups of people.

*Id.* at 339–40.  As a final diagnosis, Dr. Charles Pastor found that she was stable,

but also characterized her mood disorder as "unstable or untreated," adding that

this diagnosis affects her employment. *Id.* at 342–43.

### b.    Physician Assessments

### i.    Dr. Faiq Hameedi – Treating Psychiatrist

Dr. Faiq Hameedi, Craig's treating psychiatrist, submitted two Treating

Physician's Wellness Plan Reports, the first dated September 20, 2011, and the

second November 1, 2011. *Id.* at 389–92, 590–91.  In the September report, he

---

[2] The Federation Employment and Guidance Service, or FEGS, "was an
organization that was funded by the New York City Human Resources
Administration that provided assistance to applicants and recipients with complex
clinical barriers to employment, including medical, mental health and substance
abuse conditions, to obtain employment or federal disability benefits."  Pl. Mot., at 6
n.3.

7

explained that he had been treating Craig since 2006, and diagnosed her with mood disorder and major depression. *Id.* at 389. He wrote that she feels depressed, suffers from poor sleep, and has a poor memory. *Id.* at 389 (report is illegible); *see* Def. Mem., at 6. As to her functional capacity, he identified that she was temporarily unemployable, but did not specify for how long. R. at 390.

In the November report, Dr. Hameedi diagnosed Craig with a mood disorder, and stated that she attends scheduled appointments and takes prescribed medication. *Id.* at 391. He reported that she had anxiety, sleep disturbance, hallucinations, poor memory, poor concentration, and depression. *Id.* at 391 (report is illegible); *see* Pl. Mot., at 3. He also noted that her condition had stabilized, and she was taking Wellbutrin, Ambien, and Saphris. R. at 392. In this report, he indicated that her functional capacity rendered her unable to work for at least 12 months due to poor memory and concentration. *Id.* at 392.

### ii.    Dr. Joel Cohen – Treating Neurologist

Dr. Joel Cohen, Craig's treating neurologist, who had evaluated Craig five times between July 2006 and June 2010, evaluated her again on January 17, 2012. *Id.* at 677–83. Dr. Cohen stated that Craig had run out of Lyrica and reported that painful dysesthesias in her feet had increased. *Id.* at 683.[3] Additionally, she had developed pain in her left knee, which increased with weight bearing, and continued to have chronic non-radicular lower back pain, though the pain was not radiating

---

[3] U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/dysesthesias (last visited Nov. 22, 2016) (defining "dysesthesias" as an impairment of sensitivity especially to touch).

8

into her leg. *Id.*[4] Dr. Cohen conducted an examination, and observed that Craig

had a full range of motion at the neck, including flexion and extension. *Id.* No pain

was elicited from straight leg raising maneuvers to 90 degrees bilaterally, but Craig

experienced localized pain with flexion/extension of her left knee. *Id.* Craig had full

strength throughout all motor groups. *Id.* She had decreased sensation to light

touch, pin, and vibration in a "stocking" distribution, and deep tendon reflexes were

absent. *Id.* A Romberg sign was "mildly positive," and there was no nystagmus or

dysmetria. *Id.*[5] He observed Craig's gait to be antalgic. *Id.*

Dr. Cohen's impressions were that Craig's examination remained suggestive

of sensory polyneuropathy, as secondary to her diabetes. *Id.*[6] He recommended she

---

[4] U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/radicular%20 (last visited Nov. 22, 2016) (defining "radicular" as of, relating to, or involving a nerve root).

[5] U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/Romberg%20sign%20 (last visited Nov. 22, 2016) (defining "Romberg sign" as diagnostic sign of tabes dorsalis and other diseases of the nervous system consisting of a swaying of the body when the feet are placed close together and the eyes are closed); *id.* at http://c.merriam-webster.com/medlineplus/nystagmus%20 (defining "nystagmus" as involuntary usually rapid movement of the eyeballs (as from side to side) occurring normally with dizziness during and after bodily rotation or abnormally following head injury or as a symptom of disease); *id.* at http://c.merriam-webster.com/medlineplus/dysmetria (defining "dysmetria" as impaired ability to estimate distance in muscular action).

[6] U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/polyneuropathy (last visited Nov. 22, 2016) (defining "polyneuropathy" as a disease of nerves; especially: a noninflammatory degenerative disease of nerves usually caused by toxins (as of lead)).

9

resume taking Lyrica, which had previously improved her painful dysesthesias. *Id.* He also suggested an orthopedic evaluation of her left knee. *Id.*

### iii. Dr. Michael Alexander – Psychiatric Consultative Examiner

On March 15, 2012, Dr. Michael Alexander conducted a consultative psychiatric examination of Craig. *Id.* at 561–64. Dr. Alexander concluded that Craig could follow simple directions and perform simple tasks independently, though she would benefit from supervision on complex tasks due to lack of motivation. *Id.* Overall, he found that the examination was consistent with longstanding psychiatric problems, but these problems did not interfere with Craig's ability to function on a daily basis (such as making decisions, maintaining attention and concentration, and dealing with stress). *Id.* Dr. Alexander diagnosed Craig with dysthymic disorder and panic disorder without agoraphobia, and recommended that she continue her psychiatric treatment. *Id.* at 564.[7]

### iv. Dr. Catherine Pelczar-Wissner – Internal Medical Consultative Examiner

On March 15, 2012, Dr. Catherine Pelczar-Wissner conducted a consultative internal medical examination of Craig. *Id.* at 565–70. Upon examination, Craig was 68" tall and weighed 224 pounds. *Id.* at 566. Her gait was normal and she needed no assistance. *Id.* Overall, Craig's examination appeared normal, including

---

[7] U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/dysthymia%20 (last visited Nov. 22, 2016) (defining "dysthymia" as a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem)).

her musculoskeletal system, which showed full flexion, extension, lateral flexion
bilaterally, and full rotary movement bilaterally in her cervical and lumbar spine.
*Id.* at 567. Dr. Pelczar-Wissner also reviewed x-rays of Craig's lumbosacral spine
and left knee, both of which were negative. *Id.* at 567, 569–70. She diagnosed
Craig with diabetes; hypertension; possible peripheral neuropathy, related to
diabetes; depression; and chronic marijuana use. *Id.* at 567–68. Dr. Pelczar-
Wissner found no objective limitations for Craig, giving her a stable prognosis. *Id.*
at 568.

### v.   Dr. M. Apacible – Psychiatric Consultant

On March 27, 2012, Dr. M. Apacible, a psychiatric consultant, completed a
psychiatric review and a mental residual functional capacity assessment of Craig.
*Id.* at 571–88.[8]  Dr. Apacible found that Craig suffered from dysthymic disorder and
panic disorder without agoraphobia. *Id.* at 574, 576. These disorders caused Craig
to have mild restrictions in her activities of daily living and mild difficulties
maintaining concentration, persistence or pace, but no difficulties with social
functioning and no episodes of deterioration. *Id.* at 581. Dr. Apacible found that
Craig was moderately limited in her ability to work with others, complete a normal
workweek without interruptions from psychologically based symptoms, interact
appropriately with the general public, and travel to unfamiliar places and use

---

[8] The record does not provide Dr. Apacible's qualifications or specializations, and no
actual demonstration that he or she is in fact a psychiatrist, beyond the word
"Psychiatry" in the signature line of the Psychiatric Review. R. at 571.

11

public transportation. *Id.* at 585–86. However, Dr. Apacible found that Craig was not significantly limited in her understanding and memory, nor was she significantly limited in a majority of the categories of skills under sustained concentration and persistence, social interaction, and adaptation. *Id.* at 585–86. Dr. Apacible's final assessment was that Craig was capable of unskilled to semiskilled work, with a limitation on crowded or dirty places. *Id.* at 587.

### vi.   Dr. M. Eggleston – Medical Consultant

On March 22, 2012, Dr. M. Eggleston, a medical consultant, completed a physical residual functional capacity assessment for Craig. *Id.* at 49–54.[9] Dr. Eggleston found that Craig could occasionally lift and carry 50 pounds, and frequently lift and carry 25 pounds. *Id.* at 50. Craig could stand and walk for a total of six hours, could sit for a total of six hours, and was not limited in her ability to push and pull. *Id.* Eggleston found Craig to have no postural, manipulative, visual, communicative, or environmental limitations. *Id.* at 51–53.

### c.   ALJ Hearing

ALJ Dorf held a hearing on February 21, 2013 to consider Craig's eligibility to receive DIB and SSI benefits. *Id.* at 27–48. Craig was represented by counsel at the hearing, and was the only person to testify. *Id.* First, the ALJ noted that Craig had previously applied for benefits and was denied in 2009, which led him to amend the onset date for Craig's disabilities from May 1, 2002 to January 1, 2011. *Id.* at

---

[9] The record does not provide Dr. Eggleston's qualifications or specializations. R. at 49–54.

30–31. The ALJ went on to elicit testimony about Craig's educational and employment history. *Id.* at 34–40. According to Craig, she stopped working for her last employer at some point after the woman entered a nursing home, though the ALJ cut Craig off before she could fully explain why that caused her to end her employment. *Id.* at 38–39. The ALJ elicited testimony from Craig about her diabetes, in addition to her other medical issues and symptoms, including pain and numbness in her hands and her back pain. *Id.* at 40–48. The ALJ also asked Craig about her treatment by a psychiatrist. *Id.* at 43–45. In addition, Craig listed some of the prescriptions she takes. *Id.* at 41, 45–46. Finally, Craig's attorney asked her to describe her panic attacks, and she further clarified that, though she suffered from panic attacks during the period when she was working, she only worked two to three hours at a time. *Id.* at 47.[10]

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart,* 388

---

[10] Again, the ALJ interrupted Craig's response and answered his own question about whether she suffered anxiety attacks during the time she was working part-time, stating, "The answer's yes, while working." R. at 47.

F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian,* 708 F.3d at 417 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue,* No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts,* 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de*

14

*novo* review." *DeJesus v. Astrue,* 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault,* 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir. 1994)).

## 2.    Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur,* 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.,* 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as:

15

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur,* 722 F.2d at 1037 (citations omitted).

### a.     Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue,* 729 F.3d 172, 173 n.1 (2d Cir. 2013) (quoting *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir. 1996)). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.;* 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

16

The claimant bears the burden at steps one through four of the sequential analysis. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009).

Where an alleged impairment is based on an affective or mood disorder, the impairment is considered to be "listed" as a qualifying impairment at step three if it satisfies one of two alternative sets of criteria. The first, the "paragraph B" criteria, states that an impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, or diminished functioning, each of extended duration. 20 C.F.R. Pt. 404, Subt. P, App. 1, § 12.04(B). To be listed under the second, the "paragraph C" criteria, the claimant must show a:

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended duration; or
> > 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> > 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.* § 12.04(C).  According to the regulations, "marked" is defined as "more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C).

### b.    Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims,* 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.1512(d)-(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue,* No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

18

Whether the ALJ has met his duty to develop the record is a threshold question. Before reviewing whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel,* 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *Perez*, 77 F.3d at 47. Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.   Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. § 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the

19

opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue,* No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran*

20

*v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell,* 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian,* 708 F.3d at 420 (quoting *Burgess,* 537 F.3d at 129); *see Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue,* No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *report and recommendation adopted,* 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social

21

Security Administration's attention that tend to support or
contradict the opinion.

*Halloran,* 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based

on these considerations, the ALJ declines to give controlling weight to the treating

physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons

for the weight" ultimately assigned to the treating source. *Halloran,* 362 F.3d at 33;

*accord Snell,* 177 F.3d at 133 (responsibility of determining weight to be afforded

does not "exempt administrative decisionmakers from their obligation . . . to explain

why a treating physician's opinions are not being credited") (referencing *Schaal,* 134

F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the SSA

"always give good reasons in [its] notice of determination or decision for the weight"

given to the treating physician. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not

hesitate[d] to remand [cases] when the Commissioner has not provided good

reasons." *Pena ex rel. E.R.,* 2013 WL 1210932, at \*15 (quoting *Halloran,* 362 F.3d

at 33) (second and third alteration in original) (internal quotation marks omitted).

### d.    Claimant's Credibility

As to the credibility of a claimant, here, too, the reviewing court must defer to

an ALJ's findings. *Osorio v. Barnhart,* No. 04-CV-7515 (DLC), 2006 WL 1464193, at

\*6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and

other symptoms, the ALJ must first determine that there are 'medical signs and

laboratory findings which show that [the claimant has] a medical impairment which

could reasonably be expected to produce the pain.'" *Vargas v. Astrue,* No. 10-CV-

22

6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177

F.3d at 135 and 20 C.F.R. § 404.1529(a)).  So long as the "findings are supported by

substantial evidence, the court must uphold the ALJ's decision to discount a

claimant's subjective complaints of pain."  *Vargas*, 2011 WL 2946371, at *11

(quoting *Aponte v. Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591

(2d Cir. 1984)).  However, these findings must "be set forth with sufficient

specificity to permit intelligible plenary review of the record."  *Pena*, 2008 WL

5111317, at *10 (internal quotation marks omitted) (quoting *Williams ex rel.*

*Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).

Because subjective statements about symptoms alone may not establish a

disability, the ALJ follows a two-step analysis for evaluating assertions of pain and

other limitations.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20

C.F.R. § 404.1529(a)).  First, the ALJ must weigh whether "the claimant suffers

from a medically determinable impairment that could reasonably be expected to

produce the symptoms alleged."  *Id.* (citing 20 C.F.R. § 404.1529(b)).  If the answer

at the first step of the analysis is yes, the ALJ proceeds to the second step and

considers "the extent to which [the claimant's] symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence of

record."  *Id.* (citing 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted).

Because "an individual's symptoms can sometimes suggest a greater level of

severity of impairment than can be shown by the objective medical evidence alone,"

the ALJ may take into account a variety of other considerations as evidence.  *Pena*,

2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms and their effects; other alleviating measures taken by the claimant; and other factors that relate to the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.*

## B.    The ALJ's Decision

In his March 13, 2013 decision, the ALJ concluded that Craig was not disabled as defined by the Social Security Act. R. at 21. Following the five-step inquiry, at step one the ALJ found that Craig had not been engaged in substantial gainful activity since January 1, 2011, the amended onset date of Craig's impairments. *Id.* at 17. At step two, the ALJ found that Craig had the severe impairment of diabetes mellitus. *Id.* The ALJ also found that Craig's mental impairment of mood disorder was "nonsevere" because it did not cause more than minimal limitation in her ability to perform basic mental work activities. *Id.* In reaching this conclusion, the ALJ briefly considered the statement of Craig's treating "psychologist." *Id.* at 17–18.[11] The ALJ attributed "little weight" to Dr. Hameedi's opinion that Craig would be unable to work for at least 12 months because the opinion was "unsupported by treatment records," "inconsistent with the

---

[11] The ALJ repeatedly referred to Craig's treating *psychiatrist*, Dr. Faiq Hameedi, as "Dr. Mameed," a treating *psychologist*. R. at 17, 169, 390, 392.

consultative psychologist's and medical consultant's opinions," and because the "determination of disability is reserved to the Commissioner." *Id.* The consultative psychologist, Dr. Alexander, concluded that Craig's psychiatric problems did not significantly interfere with her ability to function on a daily basis, and the ALJ afforded "great weight" to Dr. Alexander's opinion because he had examined Craig and supported his opinion with clinical findings from the examination. *Id.* at 18. The ALJ also attributed "great weight" to the opinion of the psychiatric consultant, Dr. Apacible, who believed that Craig had no psychological limitations, because he had formed his opinion after reviewing the entire record and his opinion was consistent with the consultative psychologist's opinion. *Id.*

In evaluating Craig's mental disorder, the ALJ considered the four broad functional areas set out in section 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00C of the Listing of Impairments, and found that Craig had only mild limitations in the areas of 1) daily living; 2) social functioning; and 3) concentration, persistence, or pace. *Id.* The ALJ found no episodes of decompensation in the fourth functional area. *Id.* at 19. The ALJ determined that Craig's mental impairments were nonsevere, because Craig's mental impairment caused only mild limitations in the first three functional areas, and no limitation in the fourth. *Id.*

At step four, the ALJ found that none of Craig's impairments met or equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* Finally, at step five, the ALJ found that Craig had the residual functional capacity to perform "light work . . . limited to simple repetitive work that involves

25

no more than one or two step tasks or instructions." *Id.* To make that finding, the ALJ first found that Craig did, in fact, suffer from physical and mental impairments, namely mood disorder, bipolar disorder, anxiety attacks, depression, ADD, OCD, neuropathy, diabetes, high blood pressure, and chronic anemia. *Id.* at 20. However, the ALJ found that Craig's statements about the intensity, persistence, and limiting effects of those impairments were "not entirely credible," and thus the record in its entirety did not support a finding that Craig's impairments prevented her from performing basic work activities. *Id.* at 20–21.[12] The ALJ afforded great weight to Dr. Pelczar-Wissner's opinion that Craig had no physical limitations, as she had examined Craig. *Id.* at 20. The ALJ did not determine what weight he afforded the opinion of Dr. Cohen, Craig's treating neurologist, and only stated that Dr. Cohen noted Craig's knee pain and antalgic gait, and advised her to resume taking Lyrica for the pain. *Id.* Finally, the ALJ

---

[12] The ALJ did not explicitly state the basis for his finding that Craig was not credible, stating only that it was "for the reasons explained in this decision." R. at 20. Before finding that Craig was not entirely credible, "the ALJ was required to consider all of the evidence of record," including Craig's own testimony and statements. *Genier*, 606 F.3d at 50. Even granting the ALJ a generous reading of his credibility determination, he repeatedly misrepresented Craig's description of her symptoms. For example, the ALJ stated that Craig "alleges having manual dexterity problems," but is able to button items. R. at 20. In fact, Craig stated that she requires her daughter's assistance to zip or button her coat, "because sometime[s] I don't feel it." *Id.* at 42. The ALJ went on to state that Craig claimed to have thoughts of hurting herself, but could not give details and suicidal ideation was not "reference[d] in the record." *Id.* at 20. Yet Craig reported multiple times in the record that she experiences regular suicidal thoughts. *Id.* at 173, 329, 416. Further, the ALJ took Craig's statements about her capacity out of context in concluding that she reported that she was able to shop and take public transportation, *id.* at 21, when she actually reported that she required accompaniment on such trips. *Id.* at 37, 48, 150, 331; *cf. id.* at 563.

26

reviewed Craig's treatment records from Montefiore, and described her treatment there as a "substantially normal physical examination." *Id.* The ALJ concluded that "[t]here is no indication from the medical record that the claimant's conditions have recently exacerbated or cause the claimant any more difficulty than they did while she was gainfully employed." *Id.* at 21.

Based on his analysis, the ALJ found that Craig was capable of performing work as a home health aide, which he found she had actually performed in the past. *Id.* He noted that she had stopped her work because her client moved to a nursing home, not because of Craig's mental or physical impairments. *Id.* Finally, he concluded that the work did not exceed the light exertional level and there was no evidence indicating that Craig could not meet the mental demands of the job. *Id.*

C.    **Analysis**

Craig contends that the ALJ and the Appeals Council committed several errors by denying her applications for DIB and SSI. First, she claims that the Appeals Council erred by refusing to consider the MRIs that she submitted as new and material evidence. Pl. Mem., at 1–4. Second, she argues that the ALJ did not apply the correct legal standard when determining what weight to grant the opinions of Dr. Hameedi and Dr. Cohen, and that their opinions were supported by substantial evidence in the record. *Id.* at 5–9. Finally, Craig contends that the ALJ erred by not properly considering her obesity and the side effects of her medications when determining her physical and mental limitations. *Id.* at 9–12. For the reasons that follow, the Court remands Craig's case based on the ALJ's failure to

provide good reasons for assigning Dr. Hameedi's opinion less than controlling weight, and for failure to develop the record.[13]

### 1.   The ALJ Failed to Provide Good Reasons for Assigning "Little Weight" to Dr. Hameedi's Opinion.

Craig argues that the ALJ erred by giving Dr. Hameedi's opinion "little weight," because Dr. Hameedi was Craig's treating psychiatrist and his opinion was supported by the record. Pl. Mem., at 6–9. The Commissioner counters that the ALJ provided good reasons for not giving Dr. Hameedi's opinion more weight: the opinion was inconsistent with evidence in the record, and Dr. Hameedi's opinion went to the issue of disability, which is reserved for the ALJ. Def. Mem., at 20–21. The Court need not reach the issue of whether Dr. Hameedi's opinion was supported by the record, because the ALJ did not properly analyze and explain his reasons for giving Dr. Hameedi's opinion little weight.

The ALJ only provided two reasons for affording Dr. Hameedi's opinion little weight: He determined that the opinion was unsupported by treatment records and that it was inconsistent with the opinions of Dr. Alexander and Dr. Apacible. R. at 17–18. Only the latter justification qualifies as a factor the ALJ must consider when determining what weight to give a doctor's opinion. *See Halloran,* 362 F.3d at 32. The ALJ also needed to consider the evidence that *supported* Dr. Hameedi's opinion; the length of the treatment relationship between Dr. Hameedi and Craig, including the frequency of examination; the nature and extent of the relationship;

---

[13] Given these reasons for remand, the Court will not address Craig's other arguments.

28

and Dr. Hameedi's specialization. *See* 20 C.F.R. § 404.1527(c)(2)–(6); *see also Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at \*20 (S.D.N.Y. June 25, 2014) (ALJ's failure to explain weight given to treating psychiatrist's opinion required remand).

For example, the ALJ did not consider that Dr. Hameedi has treated Craig once every four weeks since approximately 2006. *Id.* at 43–44, 389. The length and frequency of Dr. Hameedi's treatment of Craig is "especially relevant in evaluating a claimant's psychiatric impairments." *Gorman v. Colvin*, No. 13-CV-3227 (JG), 2014 WL 537568, at \*6 (E.D.N.Y. Feb. 10, 2014) (citing *Rodriguez v. Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL 637154, at \*26 (S.D.N.Y. Mar. 9, 2009)). The ALJ did not weigh the impact that Dr. Hameedi's regular observations of Craig, over a sustained period of time, had on the merits of his opinion. *See Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing. The rule is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time.") (emphasis added).

The ALJ also failed to discuss evidence in the record that supported Dr. Hameedi's opinion. The ALJ could have considered Craig's testimony at the hearing about her symptoms, R. at 37–38, 44–48; her description of her symptoms during the FEGS evaluation that resulted in a diagnosis of mood disorder, *id.* at

329, 342; and elements of the consultative psychiatrist's findings and observations of Craig that were consistent with Dr. Hameedi's opinion. *Id.* at 561–64 (Dr. Alexander found that Craig had longstanding psychiatric problems, including dysthymic disorder and panic disorder). Finally, there is no evidence that the ALJ considered the specializations of the medical professionals in relation to what weight to give their opinions. *See, e.g., Ramos v. Comm'r of Soc. Sec.*, No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding case because, in part, ALJ did not indicate what weight he assigned treating physician's medical opinion based on specialization); *Clark v. Astrue,* No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) (legal error where ALJ did not consider whether opinion was from a specialist).

As noted, the only relevant factor the ALJ discussed was that Dr. Hameedi's opinion was "inconsistent with the consultative psychologist's and medical consultant's opinions." R. at 17–18. Even then, beyond that conclusory statement, the ALJ did not explain what was contradictory between their opinions and Dr. Hameedi's opinion. "Conclusory statements . . . are insufficient reasons for assigning less weight to the opinion of treating physicians." *Agins-McClaren v. Colvin*, No. 14-CV-8648 (AJP), 2015 WL 7460020, at *8 (S.D.N.Y. Nov. 24, 2015). For these reasons, the ALJ failed to properly consider the necessary factors before giving the opinion of Dr. Hameedi, Craig's treating psychiatrist, less than controlling weight. *See Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for

not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal*, 134 F.3d at 505).

### 2.   The ALJ Did Not Fully Develop the Administrative Record.

#### a.   Medical history and treatment records from Dr. Hameedi

One reason the ALJ *did* provide for giving Dr. Hameedi's opinion "little weight" was that it was "wholly unsupported by treatment records." R. at 17. However, the absence of Dr. Hameedi's treatment records indicates that the ALJ did not fulfill his duty to develop the record and obtain Craig's complete medical history prior to rendering his decision. *See* 20 C.F.R. § 404.1512(d); *Hidalgo*, 2014 WL 2884018, at *19–20 (ALJ's reliance on gaps in administrative record to disregard treating psychiatrist's opinion was legal error). The ALJ has an affirmative duty to develop the administrative record, even where the claimant is represented by counsel, as Craig was. *See Pratts*, 94 F.3d at 37 ("It is the rule in our circuit that the ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."); *Velez v. Colvin*, No. 15-CV-487 (SAS), 2015 WL 8491485, at *7 (S.D.N.Y. Dec. 9, 2015). The ALJ's failure to develop the record is a threshold issue, because "the Court cannot rule on whether the ALJ's decision regarding [the claimant's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record." *Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *18 (S.D.N.Y. Sept. 3, 2014).

31

The administrative record does not contain any of Dr. Hameedi's treatment records, and there is no evidence that the ALJ made attempts to obtain them. "The agency is required affirmatively to seek out additional evidence *only where there are obvious gaps* in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (internal quotation marks omitted) (emphasis added). The absence of Dr. Hameedi's treatment records qualifies as an "obvious gap" for two reasons. First, Dr. Hameedi was Craig's treating psychiatrist, and an ALJ is mandated by statute to "'make every reasonable effort to obtain from the individual's treating physician . . . all medical evidence . . . necessary in order to properly make' the disability determination." *Cruz v. Astrue*, 941 F. Supp. 2d 483, 495 (S.D.N.Y. 2013) (quoting 42 U.S.C. § 423(d)(5)(B)). The duty to develop the administrative record "takes on heightened significance" when the medical records are from a claimant's treating physician, because "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510 (PGG) (HBP), 2015 WL 5472934, at *14 (S.D.N.Y. Sept. 17, 2015) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)); *see also Reynoso v. Colvin*, No. 13-CV-5587 (HBP), 2015 WL 1378902, at *14 (S.D.N.Y. Mar. 26, 2015) ("To the extent that the ALJ required further explanation or clarification from [the treating physicians], he should have contacted them for further information before rejecting their opinions.").

Second, as Craig is alleging that mental health issues limit her ability to work, the treatment records are especially necessary to evaluate her functional

capacity. "The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *Merriman*, 2015 WL 5472934, at \*19 (quoting *Hidalgo*, 2014 WL 2884018 at \*4) (internal alterations and quotation marks omitted). The SSA regulations recognize the challenges involved in evaluating mental impairments, and state that it is "vital that we review all pertinent information relative to your condition," as a single examination will not necessarily reflect a claimant's "sustained ability to function," because claimants "commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(E); *see also Hidalgo*, 2014 WL 2884018, at \*19. Craig's claims should be evaluated alongside Dr. Hameedi's treatment records, in order to afford the ALJ a longitudinal view of Craig's functional capacity.

The absence of any treatment records from Dr. Hameedi, with no documented attempts by the ALJ to obtain them, is such a clear violation of the ALJ's duty to develop the record that it is not unheard of in such cases for the Commissioner to affirmatively move to remand the case on that basis. *See, e.g., Brooks v. Acting Com'r of Soc. Sec.*, No. 12-CV-5059 (KPF), 2014 WL 1013846, at \*2 (S.D.N.Y. Mar. 14, 2014) ("The ALJ discounted [the examining psychiatrist's] observations as 'not supported by any objective clinical findings' without attempting to discover what, if

any, clinical findings supported the examining psychologist's [sic] judgment.").
Thus, a remand is appropriate here so that the ALJ may resolve any gaps in the
administrative record, particularly with regards to Craig's treatment by Dr.
Hameedi.

### b.    Opinion of Dr. Cohen

Craig also argues that the ALJ erred by not discussing what, if any, weight to
attribute to the opinion of Dr. Cohen. Pl. Mem., at 5–6. The Commissioner
dismisses this contention, simply stating that the ALJ considered Dr. Cohen's
report, which did not attribute any work-related limitations to Craig. Def. Mem., at
21. Though the ALJ referred to Dr. Cohen as Craig's "treating physician," he did
not describe the letter in the record from Dr. Cohen as an "opinion." R. at 20. The
Court has already determined that remand is appropriate, so it need not consider
whether Dr. Cohen's letter was an opinion or merely a treatment record. On
remand, the ALJ should reconsider Dr. Cohen's letter to determine whether it is a
medical opinion, and if so, what weight it must be granted. If the letter is not a
medical opinion, the ALJ should decide whether he has an affirmative duty to
obtain an opinion from Craig's treating physician. *See Jackson*, 2014 WL 4695080,
at *17–19 ("[T]he ALJ had an affirmative duty to develop the record fully by
obtaining an opinion from [the claimant's] current treating physician.").[14]

---

[14] Likewise, the administrative record contains no medical opinion from Dr. Dichter,
who was listed as Craig's primary care physician. *See, e.g.*, R. at 200.

34

### 3.     The ALJ Should Evaluate New Evidence on Remand.

The Appeals Council found that the MRIs that Craig submitted did not provide a basis for challenging the ALJ's decision because they offered "new information . . . about a later time." R. at 2.  Craig maintains that a remand is necessary to consider the MRIs, because they are medical records that support her prior statements about experiencing back pain, and therefore it was error for the Appeals Council to dismiss them solely because the reports were dated after the decision. Pl. Mem., at 3 (citing *Torres v. Colvin*, No. SACV 13-01195 AN, 2014 WL 1512240, at *4–5 (C.D. Cal. Apr. 15, 2014) (remanding case to ALJ for consideration of new MRIs conducted after the ALJ's decision)).  The Commissioner counters that the Court need not consider the MRIs because substantial evidence supports the Appeals Council's decision that the MRIs related to a later time than the ALJ's decision. Def. Mem., at 23–24.  She further argues that the evidence would not have influenced the decision denying Craig benefits, since the reports did not include analysis by a physician about whether the results of the MRIs indicated that Craig had any physical limitations. *Id.* at 25.  Given that the case is being remanded, the Court will not address these arguments.  However, on remand, the ALJ should assess the MRIs in order to review Craig's claims on a complete record. *See Vasquez v. Colvin*, No. 14-CV-7194 (JLC), 2015 WL 4399685, at *16, 21 (S.D.N.Y. July 20, 2015); *see also Perez*, 77 F.3d at 45 ("[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record . . . .").

35

## III.   CONCLUSION

For the foregoing reasons, Craig's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).  Specifically, on remand, the ALJ should:

(1)    Further develop the evidentiary record by soliciting treatment records from Dr. Hameedi in order to address Craig's mental functional limitations;

(2)    Specify, upon further development of the record, what weight he affords to Dr. Hameedi's opinion, if it is not deemed controlling;

(3)    Provide a comprehensive analysis for why he affords this particular weight to Dr. Hameedi's opinion, if it is not deemed controlling, based on the appropriate factors outlined above;

(4)    Further develop the evidentiary record by soliciting a completed medical questionnaire or similar testimony from Craig's treating physician(s) regarding her symptoms and functional limitations, or specify what weight he affords to Dr. Cohen's opinion;

(5)    Reevaluate Craig's credibility based on further development of the record; and

(6)    Consider Craig's submissions to the Appeals Council.

36

The Clerk of the Court is directed to close docket entries 12 and 15, and to terminate this action.

**SO ORDERED.**

Dated:      November 22, 2016
            New York, New York

_____
JAMES L. COTT
United States Magistrate Judge